FILED ✓      LODGED ___
RECEIVED ___      COPY ___

JAN 1 7 2024

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

1   Jason Crews
    1515 N Gilbert Rd Ste 107-204
2   Gilbert, AZ 85234
    602-295-1875
3   Jason.crews@gmail.com

4

5

6

7                UNITED STATES DISTRICT COURT

8                 FOR THE DISTRICT ARIZONA

9                    PHOENIX DIVISION

10

11  Jason Crews,                          Case No.:   **CV24-00109-PHX-JJT**

12              Plaintiff,

13  vs.                                    Complaint for Violations of:

14  God Family Home Solutions, LLC,        1.      NEGLIGENT VIOLATIONS OF
                                           THE TELEPHONE CONSUMER
15  and                                    PROTECTION ACT [47 U.S.C. §227 ET
16  Fabian Murillo                         SEQ.]

17              Defendants.                2.      WILLFUL VIOLATIONS OF
18                                         THE TELEPHONE CONSUMER
19                                         PROTECTION ACT [47 U.S.C. §227 ET
20                                         SEQ.]
21

22

23

24                                         DEMAND FOR JURY TRIAL
25

26

27  ///
28

COMPLAINT- 1

## COMPLAINT

### Preliminary Statement

1.  Plaintiff Jason Crews ("Plaintiff") brings this action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C § 227, a federal statute enacted in response to widespread public outrage about the proliferation of intrusive, nuisance calling practices. See *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012).

2.  The Defendants in this action God Family Home Solutions, LLC and Fabian Murillo orchestrated placing at two illegal telemarketing calls using an Automated Telephone Dialing System ("ATDS") to a number assigned to a cellular service which was included on the national Do-Not-Call List.

3.  Plaintiff never consented to receive such calls.

### Parties

4.  Plaintiff Jason Crews ("Crews") is and was a resident of Maricopa County, Arizona at all relevant times, and a resident of this District.

5.  Defendant God Family Home Solutions, LLC("GFHS"), incorporated in California and is in the business of buying and selling real-estate.

6.  Defendant Fabian Murillo ("Murillo"), a resident of Los Angeles, California, was at all times relevant the owner and manager and owner of Murillo who directed and authorized the illegal calls complained of herein.

### Jurisdiction & Venue

7.  The Court has federal question subject matter jurisdiction over these TCPA claims: *Mims v. Arrow Fin. Services, LLC*, 132 S. Ct. 740 (2012).

8.  The Court has specific personal jurisdiction over the Defendants because they have repeatedly placed calls to Arizona residents, including the Plaintiff. Defendants purposely placed calls to Arizona residents.

9.  The venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District, as the calls to Plaintiff were placed into this District.

COMPLAINT- 2

## The Telephone Consumer Protection Act

8.   In 1991, Congress enacted the TCPA to regulate the explosive growth of the automated calling industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy[.]": Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

9.   Under the TCPA, an individuals such as Murillo may be personally liable for the acts alleged in this Complaint pursuant to 47 U.S.C. § 217 of the TCPA, which reads, inter alia:

> [T]he act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, Case 2:22-cv-02724-ER Document 1 Filed 07/11/22 Page 2 of 11 3 shall in every case be also deemed to be the act, omission, or failure of such carrier or user as well as of that person. 47 U.S.C. § 217 (emphasis added).

10.   When considering individual liability under the TCPA, other Courts have agreed that an officer or individual involved in the telemarketing at issue may be personally liable under the TCPA. See, e.g., *Jackson Five Star Catering, Inc. v. Beason*, 2013 U.S. Dist. LEXIS 159985, *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute.") (cleaned up) and *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415-16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

11.   Murillo personally participated in the complained-of actions by personally directing and authorizing the scripting and selecting of calls to be made, selecting, and orchestrating the calling strategy, including by choosing to use and ATDS system.

## Factual Allegations

12.   To promote their services Defendants also relied on the use of ATDS systems.

13. Plaintiff had no prior business relationship with Defendants.

14. Plaintiff is a "person" as defined by 47 U.S.C. § 153(39).

15. Defendant Fabian Murillo is a "person" as defined by 47 U.S.C. § 153(39).

16. The phone number (602) 295-XXXX ("Cell Number") belongs to Plaintiff.

17. The Cell Number has been on the Do-Not-Call registry since November 7, 2006.

18. Despite this registration, Defendants placed the calls summarized in the following table with an Automated Telephone Dialing Systems ("ATDS").

| Date | Time | Caller ID |
|------|------|-----------|
| 1/3/24 | 2:20 PM | (520)650-0377 |
| 1/4/24 | 1:50:00 PM | (818)414-2603 |

19. The Cell Number is assigned to a cellular phone used exclusively for personal residential purposes.

20. Plaintiff did not consent to receive telephone calls via ATDS.

21. Plaintiff did not consent to telemarketing calls of any kind from Defendants.

22. The Cell Number is not associated with a business.

Calls to Plaintiff

23. On or about January 3, 2024, at 2:20 pm, Plaintiff received a call presenting caller ID (520)650-0370 which, because it interrupted Plaintiff while at work, he was unable to answer.

24. On or about January 3, 2024, at 2:21 pm, Plaintiff stopped working and returned the to (520)650-0370.

25. Plaintiff was greeted by an individual who identified themselves as Maya and who asked for Elizabeth.

26. Elizabeth is unknown to Plaintiff, and he informed Maya that they had the wrong number.

27. Maya then immediately asked if Plaintiff had any properties he would like to sell.

COMPLAINT- 4

28.  Plaintiff, having received numerous calls in the past from individuals such as Maya attempting use telemarketing to convince him to sell his property decided to play along with the caller in order to learn their identity and hopefully put a stop to any future telemarketing activities.

29.  Plaintiff requested the name of the company that Maya representative which she refused provide.

30.  After failing to get identifying information from Maya, Plaintiff said "I don't feel very comfortable. You have a nice day and I'll let you, I'll let you, I'll call you back if I  change my mind."

31.  On or about January 5, 2024, Plaintiff received a telephone call from an individual who identified themselves as Defendant Murillo.

32.  Murillo stated that his associate called yesterday.

33.  Upon information and belief that associate is Maya.

34.  Plaintiff was surprised to receive the phone call after telling May he wasn't interested and that he would call her back if he changed his mind.

35.  Hoping he could ascertain the identity of Murillo, he played along with the call, once again hoping he could put a stop to the illegal telemarketing calls.

36.  Murillo discussed purchasing Plaintiffs property or assisting Plaintiff with listing and selling it on the open market.

37.  Murillo asked how much money Plaintiff would require to transfer the property into his name.

38.  Murillo agreed to send Plaintiff a formal offer.

39.  Throughout the remainder of that day Murillo sent Plaintiff a formal offer to purchase his property.

40.  Throughout the remainder January 4 and periodically through January 6, 2024, Plaintiff and Murillo exchanged emails.

41.  Once Plaintiff believed he had ascertained Murillo's true identity, he sent Murillo an email requesting evidence of any consent in their possession evidencing

COMPLAINT- 5

1  Plaintiff's consent to received telemarketing calls using an ATDS, consent to

2  telemarketing calls, a copy of Defendants' internal do not call policies, and to be placed

3  on their internal do not call policy.

4  42. Plaintiff did not receive evidence of consent to received telemarketing calls

5  using an ATDS.

6  43. Plaintiff believes and therefor avers that this is because no evidence of consent

7  to received telemarketing calls using an ATDS exists.

8  44. Plaintiff did not receive evidence of consent to received telemarketing calls.

9  45. Plaintiff believes and therefor avers that this is because no evidence of consent

10  to receive telemarking calls exists.

11  46. Plaintiff did not receive a copy of Defendants' internal do not call policies.

12  47. Plaintiff believed and therefor avers that this is because no internal do not call

13  policy exists.

14  48. The Plaintiff has been harmed, injured, and damages by the calls including,

15  but not limited to: reduced device storage space, reduced data plan usage, anger,

16  frustration, invasion of privacy, more frequent cell phone charging and reduced

17  enjoyment of Plaintiff's cell phone.

18  **Defendants' Use of an ATDS**

19  49. God Family Home Solutions, LLC's representatives did not know who they

20  were calling, asking for an individual named Elizabeth who is unknown to Plaintiff.

21  50. God Family Home Solutions, LLC's representatives solicited services did not

22  target Plaintiff individually.

23  51. The caller did not care who she was speaking to, pivoting to her telemarketing

24  script, asking if Plaintiff had any real-estate he wanted to sell.

25  52. God Family Home Solutions, LLC's representatives purposefully attempted to

26  conceal the identity of their company.

27  53. For these reasons, Plaintiff believes the telemarketers used an ATDS to

28  generate leads for Defendant's debt relief services.

54.  The calls were conducted using an Automatic Telephone Dialing System (ATDS). As the Supreme Court recently clarified, the key feature of an ATDS is the capacity to store numbers to be called using a random or sequential number generator or to produce numbers to be called using a random or sequential number generator: *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1167 (2021).

55.  The Third Circuit recently clarified that "Congress envisioned a broad understanding of 'equipment'" that constitutes an ATDS. It also clarified that the analysis of whether an ATDS was used in violation of the TCPA centers around "whether the Defendants employ[s] [ATDS] capacities to make automated calls": *Panzarella v. Navient Sols., Inc.*, 37 F.4th 867, 873, 878 (3d Cir. 2022). In so doing, it held that Congress intended to "ban all autodialed calls" because Congress "found autodialer technology to be uniquely harmful": Id. at 879 (cleaned up).

56.  In enacting the ATDS prohibition, the Third Circuit cited favorably to Congressional understanding "that telemarketers could transform ordinary computers into autodialers through minor and inexpensive modifications," including by "relying on computerized databases containing telephone numbers during their dialing campaigns": Id. at 880 (cleaned up). The Third Circuit held that, in passing the TCPA's ATDS prohibition, Congress intended to remedy the problems caused by callers using computer software to dial numbers randomly or sequentially from a list or database: *Id.*

57.  The system(s) that Defendants used to place the calls to Plaintiff is/are an ATDS because it would be illogical to dial a number manually, have Plaintiff answer the phone, and only then connect Plaintiff to a human being.

58.  Audible pauses, clicks, and beeps are hallmark indicia of ATDS systems. This supports the inference that Defendants used an ATDS, such as one that "use[s] a random [or sequential] number generator to determine the order in which to pick phone numbers from a pre-produced list": *Facebook*, 141 S. Ct. at 1171 n.7.

59.  Other courts have held, post-Facebook, that allegations similar to those herein of the absence of a relationship between the parties, and the random nature of the

1  automation device (such as the ability to randomly generate caller ID numbers), are all
2  indicia of use of a random or sequential dialing device. This gives rise to the inference at
3  the pleadings stage that an ATDS was used to make the calls: *Camunas v. Nat'l*
4  *Republican Senatorial Comm.*, No. 21-1005, 2021 U.S. Dist. LEXIS 100125 at *11 (E.D.
5  Pa. May 26, 2021).
6      60.  No facts exist here to support the conclusion that Defendants was calling from
7  a curated list of his past customers. In contrast to a company that dials calls en masse to
8  multiple individuals from a list of telephone numbers (as here), a company that calls its
9  existing customers utilizing an imported customer list does not place calls using an
10 ATDS. Such calling uses a database targeting existing customers' information rather than
11 computer-generated tables or lists of individuals to be called: *Panzarella*, 37 F.4th at
12 881–882.
13     61.  Plaintiff is ignorant of the exact process by which the system(s) used by
14 Defendants operates other than by drawing the reasonable inference and alleging that the
15 system(s) stores or produces telephone numbers randomly or possibly sequentially based
16 on the facts ascertainable from the calls Plaintiff received, as outlined above. Indeed, as
17 at least one district court explained, "The newly clarified definition of an ATDS is more
18 relevant to a summary judgment motion than at the pleading stage": *Gross v. GG Homes,*
19 *Inc.*, No. 3:21-cv-00271-DMS-BGS, 2021 WL 2863623, at *7 (S.D. Cal. July 8, 2021);
20 accord *Miles v. Medicredit, Inc.*, No. 4:20-cv- 01186-JAR, 2021 WL 2949565 (E.D. Mo.
21 July 14, 2021).
22                   **Defendants' Conduct Was Knowing and Willing**
23     62.  Defendants intentionally called Plaintiff multiple times in order to advertise
24 their services to Plaintiff
25     63.  Defendants knew his actions were in violation of the TCPA and willfully
26 continued his conduct.
27
28 ///

COMPLAINT- 8

## **The TCPA Prohibits All Automated Calls to Protected Numbers**

64. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automated telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the party is charged for the call": 47 U.S.C. § 227 (b)(1)(A)(iii).

65. Congress singled out these services for special protection because Congress realized their special importance in terms of consumer privacy (as is the case with cellular phones): *Barr v. Am. Ass'n of Pol. Consultants Inc.*, 140 S. Ct. 2335, 2356, (2020) (Gorsuch, J. & Thomas, concurring in part and dissenting in part).

66. According to findings by the Federal Communications Commission ("FCC"), which is the agency Congress vested with the authority to issue regulations implementing the TCPA, such messages are prohibited because, as Congress found, automated or prerecorded messages are a greater nuisance and invasion of privacy than live ones, are costly, and are inconvenient.

67. The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(1)(A). 47 U.S.C. § 227(b)(1)(3).

68. These causes of action apply to users of any of four protected services (pager, cellular, specialized mobile radio [i.e., radio telephony locator beacon or dispatch system], or another radio common carrier service [i.e., ship-to-shore or air-to-ground]), or any service, including residential, VoIP, and landline services, for which the called party is charged: *Lynn, Monarch Recovery Mgmt. Inc.*, 953 F. Supp. 2d 612, 623, (D. Md. 2013).

69. "Non-Emergency pre-recorded voice or autodialed calls to the destinations enumerated in 47 U.S.C. § 227(b)(1)(A) are permissible only with the prior express consent of the called party."

70. U.S.C. § 227(c)(2) states, "No person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his or her telephone number on the National Do-Not-Call Registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government" and defines "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person...": U.S.C. § 227(f)(15).

71. The FCC also recognized that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used": In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, CG Docket No. 02-278, Report and Order, 18 FCC Rcd. 14014, 14115, ¶ 165 (2003).

72. In 2013, the FCC required prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers and residential lines. Specifically, it ordered:

[A] Consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service."

73. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 (2012) (footnotes omitted).

74. 47 C.F.R. § 64.1200 extends 47 U.S.C. § 227 and establishes several delivery restrictions. It states, "No person or entity may ... [e]xcept as provided ... initiate any telephone call ... using an automatic telephone dialing system or an artificial or prerecorded voice."

75. 47 C.F.R. § 64.1200(a)(1) specifically protects the following: "emergency telephone line," "guest room or patient room of a hospital, health care facility, elderly

home, or similar establishment," and/or "cellular telephone service." 47 C.F.R. § 64.1200(a)(2) further prohibits entities from "initiat[ing], or caus[ing]to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, to any of the lines or telephone numbers described… "

76.     The National Do-Not-Call Registry allows consumers to register their telephone numbers and thereby indicate their desire to not receive telephone solicitations at those numbers: 47 C.F.R. § 64.1200(c)(2).

77.     A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator": *Id.*

78.     The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers whose numbers are on the Registry and provide a private right of action against any entity making those calls or "on whose behalf" such calls are promoted: 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

79.     47 C.F.R. § 64.1200(d) states, "No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity." It goes on to establish specific "minimum standards":

(1) "Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand…"

(2) "[P]ersonnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list."

(3) "If a person or entity making a call for telemarketing purposes … receives a request … not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name … and telephone number on the do-not-call

list at the time the request is made … must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made."

(4) "A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted."

(5) "A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further telemarketing calls."

## Claims

### Count One

80.     Plaintiff incorporates the foregoing allegations as fully set forth herein.

81.     The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute violations of the TCPA, 47 U.S.C. § 227, by sending calls, except for emergency purposes, to Plaintiff's telephone which is assigned to a cellular telephone service using an ATDS.

82.     As a result of their unlawful conduct, Defendants invaded Plaintiff's personal privacy, causing Plaintiff to suffer damages and, under 47 U.S.C. § 227(b)(3)(B), entitling him to recover $500 in civil fines for each violation and an injunction requiring Defendants to stop his illegal calling campaign.

83.     Plaintiff is also entitled to and does seek injunctive relief prohibiting Defendants and/or his affiliates, agents, and/or other persons or entities acting on Defendants' behalf from violating the TCPA, 47 U.S.C. § 227, by making calls or sending messages, except for emergency purposes, to any number using an artificial or prerecorded voice in the future.

84.     Plaintiff is entitled to an award up to $1500 in damages for each knowing and willful violations of 47 U.S.C. § 227(b)(3)(B)

85.     Defendants' violations were willful and/or knowing.

///

1

### Count Two

2    86.    Plaintiff incorporates the foregoing allegations as fully set forth herein.

3    87.    Defendants called Plaintiff's private residential telephone number which

4  was registered on the National Do-Not-Call Registry more than thirty-one (31) days prior

5  to the calls, in violation of 47 U.S.C. § 227(c)(3)(F) and 47 C.F.R. § 64.1200(c)(2).

6    88.    As a result of their unlawful conduct, Defendants invaded Plaintiff's

7  personal privacy, causing Plaintiff to suffer damages and, under 47 U.S.C. § 227(c)(3)(F)

8  entitling him to recover $500 in civil fines for each violation and an injunction requiring

9  Defendants to stop his illegal calling campaign.

10   89.    Plaintiff is entitled to an award up to $1500 in damages for each knowing

11  and willful violations of 47 U.S.C. § 227(c)(3)(F).

12   90.    Defendants' violations were willful and/or knowing.

13   ### Relief Sought

14  WHEREFORE, Plaintiff requests the following relief:

15   A. Injunctive relief prohibiting Defendants from calling or engaging another party

16     to call telephone numbers using ATDS.

17   B. Because of Defendants' violations of the TCPA, Plaintiff seeks for himself

18     $500 in damages for each violation or—where such regulations were willfully or

19     knowingly violated—up to $1,500 per violation, pursuant to 47 U.S.C. §

20     227(b)(3).

21   C. Because of Defendants' violations of the TCPA, Plaintiff seeks for himself

22     $500 in damages for each violation or—where such regulations were willfully or

23     knowingly violated—up to $1,500 per violation, pursuant to 47 U.S.C. §

24     227(c)(3).

25   C. Such other relief as the Court deems just and proper.

26

27

28

COMPLAINT- 13

1    RESPECTFULLY SUBMITTED on this January 13, 2024.

2

3                                                     Jason Crews

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT- 14